**George WAGERS, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–3238.**

Court of Appeals of Alaska.

April 26, 1991.

Rex Lamont Butler, Anchorage, for appellant.

W.H. Hawley, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS, J., and ANDREWS, Superior Court Judge.*

_____

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

## OPINION

COATS, Judge.

George Wagers was convicted, following a jury trial, of misconduct involving a controlled substance in the third degree, a class B felony. AS 11.71.030(a)(1) and AS 11.16.110(2)(B). The state's theory of the case was that Wagers was the doorman at a crackhouse, and that he thereby aided and abetted in the commission of the crime of possessing a controlled substance with the intent to deliver or manufacture that substance. On appeal, Wagers argues that, under the applicable statutes, a doorman cannot be held liable as an accomplice to the crime of possession with the intent to deliver a controlled substance. Moreover, Wagers also contends that, even if a doorman could be held liable as an accomplice, the evidence in this case was insufficient to establish accomplice liability. We affirm.

In August and September of 1988, the Anchorage Police Department received crime stoppers calls indicating that there was heavy traffic in and out of a house located at 3511 Dorbrandt in Anchorage. Based on these tips, the police began to watch this house and talk to people in the neighborhood. The police observed heavy traffic going in and out of 3511 Dorbrandt. People arrived in cars, cabs, or just on foot. They talked to somebody at the door, were allowed in, and usually came back out within two or three minutes. One officer estimated that one-hundred people went to the Dorbrandt house on week nights, and many more went there on weekend nights.

On September 18, the police received an anonymous tip indicating that Wagers was at the Dorbrandt residence. The officer who was watching the residence that day estimated that between thirty and fifty persons entered the residence between nine and eleven o'clock that night; the visitors stayed in the house between two and fifteen minutes and then left the area. The officer also observed Wagers at this residence. He saw Wagers leave the house and then return.

While conducting a search in an unrelated case, the police found a piece of paper with the 3511 Dorbrandt address on it, a telephone number, and the names "Susan or Mac."

On September 20, 1988, Officer Audie Holloway called the number on the paper and asked for "Mac". Holloway referred to himself as "Lynn", and arranged to purchase one-eighth ounce of cocaine for $250.

Holloway went to the Dorbrandt residence to purchase the cocaine. When he knocked on the door, Wagers answered. At trial, Holloway testified as follows:

Q: What did you say to them?

A: I said—they said who is it. And I said, this is Lynn, I need to talk to Mac. Or something to that effect. And said I had—I had—I just got through talking to him on the phone. And then they let me in the house.

Q: Who exactly opened the door?

A: Mr. Wagers sitting right here.

Q: And did he open the door all the way and let you in immediately or ...

A: He opened the door and looked at me for a minute and then told me to come on in.

Q: And when he looked at you, how long would you say he was looking at you?

A: Just two or three seconds. Just to look me over and make sure there was nobody standing to either side of me or anything like that.

After Holloway entered, Wagers asked him what he wanted and Holloway responded that he had spoken to Mac on the phone and was there to get some stuff. Wagers told him to have a seat on the couch.

While Holloway was on the couch, he saw three other people: one woman smoking crack and two other people seated on the couch who appeared to be high on drugs or very intoxicated. He saw Wagers go to a hallway where he spoke briefly to a man with long brown hair. Wagers then went into the southeast bedroom of the house for a minute.

Wagers returned from the bedroom and told Holloway to "come on in"; they walked to the bedroom together. There

were two people in the bedroom: a woman smoking crack and a man named "VonWooden" who was just laying down a propane torch. There was a variety of drug paraphernalia and a lot of white residue on the table in this room. Holloway asked for Mac; VonWooden said he was not in the room and asked the long-haired man to take Holloway to the other bedroom.

Holloway went to the second bedroom. The man with the long hair knocked on the door and yelled for Mac. There was no response. The man looked inside and no one was there. While this was going on, Wagers remained in the general area.

Wagers took Holloway back to the living room and told him to sit on the couch and wait a few minutes. After a few minutes had passed, Wagers told Holloway to come back in thirty minutes. Wagers accompanied Holloway to the door. As Holloway was leaving, he saw three young girls on the way to the house and saw them speaking with Wagers.

On September 23, 1988, the police executed a search warrant on 3511 Dorbrandt. Holloway again knocked on the door, and when he identified himself as "Lynn," Wagers opened the door.

When the police searched Wagers, no cocaine or firearms were found on his body or within his vicinity. A butterfly knife was found in Wagers' back pocket, but he made no move to use the knife as a weapon.

Thirteen people were in the house when the police entered. In the southeast bedroom of the house the police found: two shotguns, hides and furs, a triple-beam scale, a propane torch and other paraphernalia including materials related to producing crack, a black bag containing slightly more than two ounces of cocaine with a street value of between $3,000–$4,000. Other drug paraphernalia was found in the house. Wagers and another defendant, McKentry, were charged with possessing cocaine with intent to deliver or manufacture.

■ Wagers contends that, because the state never established at trial that he possessed a controlled substance, he cannot be convicted for possession of cocaine with intent to deliver.

Alaska Statute 11.16.110(2)(B) provides as follows:

A person is legally accountable for the conduct of another constituting an offense if

(2) with intent to promote or facilitate the commission of the offense, the person

(B) aids or abets the other in planning or committing the offense....

Under the statute, Wagers may be held liable as an accomplice if, with the intent to promote or facilitate the commission of the offense, he aided or abetted another in planning or committing the offense. In *Shindle v. State*, 731 P.2d 582 (Alaska App.1987), the defendant sold cocaine with the knowledge that the cocaine would be resold by the buyer. "As long as Shindle acted with the intent to promote resale, he could be held liable as an accomplice for any sale to [the third party] that was reasonably foreseeable." *Id.* at 586 (citation omitted). There is no requirement that the accomplice actually handle the drug or directly participate in the sale. The test is whether he aids or abets the sale or plans the sale with the intent to promote or facilitate the commission of the offense. Nothing in *Shindle* bars application of this test for accomplice liability to a doorman/guard of a crackhouse. *See Murray v. State*, 778 P.2d 237, 238 (Alaska App.1989) (for a supplier of cocaine to be held criminally liable for a subsequent sale of cocaine by the buyer, the state must establish that the supplier was aware of the plan to resell the cocaine, and acted with the intent to promote that plan); *Mudge v. State*, 760 P.2d 1046, 1049 (Alaska App.1988) (to hold the defendant liable as an accomplice, the state must prove that the defendant aided the principal, knowing of the principal's criminal purpose). *See also United States v. Moya–Gomez*, 860 F.2d 706, 756 (7th Cir. 1988); *People v. Armstrong*, 160 A.D.2d 206, 553 N.Y.S.2d 169, 170 (1 Dept.1990).

■ In a related argument, Wagers contends that he is exempt from accomplice

liability under AS 11.16.120(b)(2), which states:

(b) Except as otherwise provided by a provision of law defining an offense, a person is not legally accountable for the conduct of another constituting an offense if

...,

(2) the offense is so defined that the person's conduct is inevitably incidental to its commission.

Wagers argues that the role of a doorman for a crackhouse, which is to prevent "ripoffs" or robberies by individuals entering the premises, is strictly incidental to the main business of the house—the sale and purchase of cocaine. Wagers argues that because the doorman's role is incidental, he is exempt from accomplice liability.

The commentary to AS 11.16.120(b)(2) explains that this provision was intended to:

require[ ] the legislature to decide whether the conduct inevitably incidental to a crime should be made criminal; for example, is the purchaser of sexual services guilty of prostitution? The code does not prohibit the criminalization of such conduct, it merely provides that liability does not occur unless a statute specifically provides that it does.

Commentary on the Alaska Revised Criminal Code, Senate Journal Supp. No. 47 at 4, 1978 Senate Journal 1399. The commentary to the Model Penal Code provides a similar explanation of "conduct inevitably incident to the substantive offense":

Should a woman be deemed an accomplice when a criminal abortion is performed upon her? Should the man who has intercourse with a prostitute be viewed as an accomplice in the act of prostitution, the purchaser an accomplice in the unlawful sale, the unmarried party to a bigamous marriage an accomplice of the bigamist, the bribe-giver an accomplice of the taker?

. . . .

[S]ince the exception is confined to conduct "inevitably incident to" the commission of the crime, the problem inescapably presents itself in defining the crime.

*Model Penal Code* § 2.06 comment (b) (1985). Professor LaFave gives the same examples of situations where this provision would apply and notes that the justification for this exception is

[T]hat the legislature, by specifying the kind of individual who was guilty when involved in a transaction necessarily involving two or more parties, must have intended to leave the participation by the others unpunished.

2 LaFave and Scott, *Substantive Criminal Law*, § 6.8 at 165 (1986) (footnote omitted).

The circumstances of this instant case do not fit into the exemption under AS 11.16.-120(b)(2). The crime of misconduct involving a controlled substance in the third degree necessarily involves two or more people: the person who possesses with an intent to manufacture or deliver a controlled substance and the person who purchases the controlled substance. AS 11.71.-030(a)(1). Because the purchaser is necessarily involved in the transaction and the legislature has not indicated that the purchaser should be held liable for the sale, the purchaser is exempt from accomplice liability for the sale under AS 11.16.-120(b)(2). *See Taylor v. State*, 600 P.2d 5, 9 n. 16 (Alaska 1979). However, Wagers is not a purchaser of controlled substances nor was he charged as an accomplice on the theory that he aided the purchaser. He was charged with assisting the dealer in selling the controlled substances. Because Wagers does not fall into the role of a purchaser, his conduct was not inevitably incidental to the commission of the crime, and he is not exempt from accomplice liability.

Wagers contends that his conduct was inevitably incidental to the commission of the crime because his role was similar to that of a bouncer in a bar. He argues that if a bartender was convicted of selling alcohol to a minor, the bouncer would not be an accomplice to the crime for his actions in allowing the minor onto the premises. The bouncer is an employee whose role is to keep order in the establishment, and thus, his job is incidental to the sale of alcoholic beverages. Similarly, Wagers argues that

his intent to keep order in the residence was incidental to the criminal purpose of the crackhouse.

There are two problems with this bouncer/bartender hypothetical. First, if the bouncer was aware of the criminal purpose of serving alcoholic beverages to minors, and allowed the minors into the bar with the intent to further that criminal purpose, he or she could be held liable as an accomplice. *See Shindle*, 731 P.2d at 586. There is nothing inherent in the role of a bouncer which would exempt the bouncer from accomplice liability. Similarly, if Wagers was aware of the drug sales taking place in the Dorbrandt residence and acted with the intent to further those sales, he can be held liable as an accomplice.

The second problem with this hypothetical is that a bar, unlike a crackhouse, is a legal business venture. The bouncer, acting in the capacity of maintaining order in the establishment, is furthering the purpose of that business by allowing the business to run smoothly. There is nothing inherently criminal about furthering the purposes of a legal business. However, in his role of maintaining order in the Dorbrandt residence, Wagers was furthering the purpose of an illegal business. Criminal liability can attach if he was aware of the criminal purpose and acted with the intent to further that purpose.

Therefore, because his role as a doorman/guard was not "inevitably incidental" to the commission of the crime of possession with intent to deliver, Wagers is not exempt from accomplice liability under AS 11.16.120(b)(2).

■ Wagers next argues that there was insufficient evidence presented at trial to establish that he was an accomplice to the crime of possession with intent to distribute, and the trial court therefore erred in failing to grant his motion for judgment of acquittal. Motions for judgment of acquittal are decided on the basis of whether, viewing the evidence and its inferences in the light most favorable to the state, reasonable people could differ on the question of whether guilt was established beyond a reasonable doubt. *Des Jardins v. State,*

551 P.2d 181, 184 (Alaska 1976). In order to find Wagers liable as an accomplice, the state must have presented sufficient evidence to conclude that he was aware that controlled substances were being manufactured and sold in the Dorbrandt Street residence, and that he acted with the intent to further those sales. *See Shindle*, 731 P.2d at 586.

The evidence produced at trial basically established that: the Dorbrandt residence was a crackhouse, Wagers answered the door both times the police knocked, he led Holloway through the house in search of the drug dealer Mac, he was aware that Holloway was at the residence to purchase drugs from Mac, and he carried a butterfly knife in his back pocket. Given the evidence on the amount of drugs and drug paraphernalia in plain view in the residence, and the evidence concerning the amount of traffic in and out of that residence, a reasonable juror could conclude that Wagers was aware of the criminal actions taking place in the house. Therefore, on the question of Wagers' awareness of the criminal purpose, the trial court did not err in denying the motion for judgment of acquittal.

The evidence presented in this case was also sufficient for a jury to infer that Wagers had the requisite intent. When Holloway knocked on the door and informed Wagers that he had talked to Mac about getting "some stuff," Wagers proceeded to look for Mac. In addition, Wagers appeared to be in charge of letting Holloway in and out of the house, and leading him around the house. From these actions, a reasonable juror could infer that Wagers intended to find Mac to facilitate the drug deal.

We therefore find that there was sufficient evidence in this case for a reasonable juror to conclude that Wagers was guilty beyond a reasonable doubt as an accomplice to the offense of possessing cocaine with the intent to deliver that substance.

Wagers' conviction is AFFIRMED.